IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| DONALD R. PEVIA, | * | |
| Plaintiff | * | |
| v. | * | Civil Action No. ELH-17-2798 |
| FRANK K. BISHOP, | * | |
| Defendant | * | |
| | *** | |

## MEMORANDUM

The self-represented plaintiff, Donald Pevia, is an inmate currently confined at the North Branch Correctional Institution ("NBCI"). He filed suit against Warden Frank Bishop, under 42 U.S.C. § 1983, seeking declaratory and injunctive relief based on an alleged violation of his First Amendment right to practice his religion. ECF 1. In addition, he alleges breach of a settlement agreement. Exhibits are appended to the Complaint.

Pending is a motion to dismiss, or, in the alternative, for summary judgment filed by Defendant Frank K. Bishop. ECF 13.[1] The motion is supported by a memorandum of law (ECF 13-1) (collectively, "Motion") and exhibits. Plaintiff opposes the Motion. ECF 17; ECF 23.[2] He has also submitted exhibits. *Id.*

The court finds a hearing to resolve the pending motion unnecessary. *See* Local Rule 105.6 (D. Md. 2016). For the reasons that follow, defendant's dispositive Motion, construed as a motion for summary judgment, shall be granted.

---

[1] Citations are to the court's electronic docket.

[2] The supplemental opposition response is docketed as a "Motion to File Opposition." ECF 23. The motion shall be granted.

## I. Background

In 2014, plaintiff Donald R. Pevia filed a civil rights complaint pursuant to 42 U.S.C. § 1983, alleging violations of his First Amendment right to freely practice his religion. ECF 13-3; *see also Pevia v. Shearin*, Civil Action No. ELH-14-631 (D. Md.) ("Pevia I"). Subsequently, counsel was appointed for plaintiff in Pevia I (ECF 13-4). On August 2, 2016, plaintiff signed a settlement agreement concluding Pevia I, without admission of liability on the part of defendant or the Department of Public Safety and Correctional Services ("DPSCS"). ECF 13-5. In exchange for dismissal of Pevia's claim in Pevia I, DPSCS agreed to pay Pevia monetary damages. ECF 13-5 at 2, ¶ 1(a). Further, the settlement agreement provided, *id.* ¶ 1(b):

> Each time members of the Iron House Council (or such other organization providing Native American religious services) visit North Branch Correctional Institution for religious practices, which usually occurs every two weeks, a member of Iron House Council (or such other organization providing Native American religious services) will meet with Mr. Pevia outdoors for the purpose of engaging in a Native American religious visit with a lit pipe.

From December 5, 2014 to October 19, 2016, plaintiff was classified as a Maximum Security Level II-Structured Housing inmate (MAX II-SH). ECF 13-7 (Decl. of NBCI Chaplain Kevin Lamp), ¶ 8. Facility Directive DOC 100.0004.04 defines a MAX-II SH inmate as an individual:

> (i) Sentenced to the custody of the Commissioner of Correction (Commissioner);
> (ii) Who demonstrates or is known to demonstrate dangerous, violent, or other characteristics that pose a serious threat to life, property, self, staff, other inmates, or facility security;
> (iii) Is determined to require enhanced supervision in order to remediate dangerous, violent, or other characteristics that pose a serious threat to life, property, self, staff, other inmates, or facility security; and
> (iv) If housed in general population poses a serious threat to life, property, self, staff, other inmates, or facility security.

ECF 13-8 (Facility Directive DC 100.0004(4)(a) at 2.

Plaintiff alleges that on August 9, 2016, Native American religious services were held at

NBCI and, while the rest of the Native American inmates were permitted to attend, he was not. ECF 1 at 3. Pevia asserts, *id.*: "Every week on Tuesday when service is held plaintiff was the only member denied access." He explains that the settlement agreement in Pevia I (ECF 13-5) provided that he is to attend services every other week with the Iron House Council, and any other Native American religious organization, as those groups had access to ceremonial religious items that NBCI did not provide. ECF 1 at 3-4. Pevia claims that on the weeks that Iron House was not available to conduct services at NBCI, other Native American inmates were permitted to sit in the multi-purpose room from 11:45 a.m. to 1:15 p.m. to converse. *Id*. at 4.[3]

In August of 2016, Iron House Council did not attend any Native American religious services at the facility, due to other commitments of the Council. ECF 13-7, ¶ 6. During this time, the general population of Native American inmates conducted their own services each Tuesday, which were run by an "inmate facilitator." *Id*. ¶ 7. But, MAX II-SH inmates are not permitted to attend religious services with general population inmates, and inmate facilitators are not allowed to meet with MAX II-SH inmates, due to security concerns. *Id*. ¶ 8.

According to plaintiff, on an unspecified date, he learned from fellow inmate Norman Mayes that Iron House had not been to NBCI in weeks but that the policy at NBCI had changed so that inmates were permitted access to "the tobacco, pipe, etc. etc on their own." ECF 1 at 4. Plaintiff complains that he was intentionally denied access to religious services, in violation of the settlement agreement. *Id*.

On September 13, 2016, a representative from Iron House Council attended Native American services at NBCI. ECF 13-7 at ¶ 10. The representative and Chaplain Lamp met with plaintiff in the "inside/outside" recreation area, which is described as "an enclosed area with

---

[3] Pevia does not specify the day or days of the week for such Native American gatherings.

open windows at the top." *Id.*

From August 1, 2016 to October 19, 2016, plaintiff was the only MAX II-SH inmate who followed the Native American religion and therefore was unable to participate in congregate services with other inmates during that time. ECF 13-7, ¶ 9. Plaintiff was reclassified from MAX II-SH to Maximum Security Level I on October 19, 2016. ECF 13-7, ¶ 11. The change in classification allowed him to participate in weekly congregate services with general population inmates. *Id*. ¶ 13.[4]

According to plaintiff, however, his earlier placement on "Max II" prohibited him from attending the service run by inmates during the 18 months he was housed on Max II. *Id.* And, he claims that he was unaware that the prison had provided the required religious items for inmates to conduct services on their own, until he was advised of same by Mayes. *Id.*

---

[4] Plaintiff filed the ARP complaining about the denial of religious services on September 21, 2016. ECF 1 at 9-10. Chaplain Lamp avers that Iron House Council attended Native American Services at NBCI on September 27, October 11, and October 25, 2016. ECF 13-7 at ¶ 12. Lamp avers that Housing Unit 2 was "locked down" on each of those dates due to violent incidents on the unit. *Id.* No inmates on the unit, including plaintiff, were allowed to participate in congregate religious services or meet with religious representatives on those days due to security concerns. *Id.* Plaintiff disputes that his unit was locked down on those dates and that even if it were, the settlement agreement did not specify that he could be denied access to the Native American representative due to institutional lockdown. ECF 17 at 2-3. Defendants argue that these issues are not properly before the court as plaintiff failed to exhaust his administrative remedies as to these additional dates/claims. ECF 13-1 at 11 (Memo). Plaintiff counters that it is his intention that this case encompass the period of time from the signing of the agreement in August until December, when he was permitted to attend services. ECF 23 at 1.

The court agrees with defendants that the issues before the court are limited to the time covered in plaintiff's ARP. The ARP filed by plaintiff and attached to his complaint details his complaints regarding the provision of religious services from the signing of the settlement agreement on August 2, 2016, to the filing of the ARP on September 21, 2016. To the extent Pevia intended to extend the allegations in his complaint to encompass any other dates, those claims are unexhausted and cannot be considered. Where, as here, a plaintiff's claims have not been properly presented through the administrative remedy procedure they must be dismissed pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e. *Chase v. Peay*, 286 F.Supp. 2d 523, 530 (D. Md. 2003).

Plaintiff filed an administrative remedy procedure ("ARP") on September 21, 2016, complaining that since the signing of the settlement agreement on August 4, 2016,[5] he had not been able to attend services, while all other inmates attended services and had access to religious items. ECF 1-1 at 1. Further, Pevia explained that on September 13, 2016, Chaplain Lamp and a representative from Iron House met with him in the "inside/outside" of the housing unit. *Id*. Lamp advised Pevia that he would be permitted his services in the inside/outside when Iron House representatives came to NBCI. *Id*. In the ARP, plaintiff also alleged that this violated his rights as his religious services had to be conducted on dirt or grass and that the area used was otherwise desecrated due to its use by other inmates. *Id*.

Pevia also alleged in the ARP that NBCI was intentionally violating his settlement agreement. And, he indicated that the representative from Iron House advised him they would not be back in the institution until October 11, 2016. *Id*.

On December 8, 2016, the Warden denied the ARP, finding that NBCI was compliant with the terms of the settlement agreement because plaintiff was afforded the opportunity to meet with a member of the Iron House Council when they were at the institution. ECF 1-1 at 6. It was noted that during the weeks about which plaintiff complained, "the institution was on modified movement for security reason[s], in which the entire HU#2 inmate population could not attend religious services." *Id*. Plaintiff was further advised that, pursuant to Division of Correction Directive 200-1, the Warden was authorized to modify out-of-cell activity when institutional emergencies or inmate misconduct warranted it. *Id*. The Warden also noted that the unit was no longer on modified movement and plaintiff was, at that time, housed on a tier that was permitted to attend services with the general population. *Id*.

---

[5] In fact, the agreement was signed by plaintiff on August 2, 2016. ECF 13-5. The discrepancy is not material.

Plaintiff noted a timely appeal to the Commissioner of Corrections. ECF 1-1 at 8. On February 14, 2017, the Commissioner found the appeal meritorious in part, to the extent that the Warden failed to file a timely response, but denied the merits of plaintiff's claim. *Id*. at 10. Plaintiff's appeal to the Inmate Grievance Office ("IGO") was also unsuccessful. *Id*. at 12. The IGO determined that the Warden's response to the ARP was correct. *Id*.

## II. Standard of Review

Defendants' motion is styled as motions to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland*, 672 Fed App'x. 220, 222 (4th Cir. 2016) (per curiam). However, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id*. at 165, 167.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 Fed. App'x 632, 638 (4th Cir. 2016) (per curiam); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'"

7

*Scott v. Nuvell Fin. Servs., LLC*, 789 F.Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F.Supp. 2d 414, 420 (D. Md. 2006).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (citations omitted). But, the nonmoving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted).

According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrods*, 302 F.3d at 244-45 (internal citations omitted); *see also Putney*, 656 Fed. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 Fed. App'x at 638.

Plaintiff previously sought discovery of the Housing Unit 2-D tier logs from August 10, 2016 to October 21, 2016, and the Housing Unit 2-A and B tier logs from October 21, 2016 through December 31, 2016. ECF 18. I denied plaintiff's request, finding that he failed to explain how the requested material was necessary to his claim. ECF 19; ECF 20.[6] I am satisfied that it is appropriate to address defendants' motion as one for summary judgment, because it will facilitate resolution of this case.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). The court should "view the evidence in the light most

---

[6] Pending is plaintiff's motion for reconsideration of the Order denying discovery. ECF 22. Plaintiff reiterates his contention that the log books would prove his case and demonstrate that defendants perjured themselves. *Id*. at 1. Plaintiff has not overcome the deficiencies in the discovery request I previously noted. Moreover, as noted above, the case before the court solely concerns the denial of religious services from August 2, 2016, to the filing of plaintiff's ARP on September 21, 2016. The requested log books are outside of this time period and are not relevant to the pending claim. The motion for reconsideration is denied.

favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002); *see FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id*. at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*.

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

### III. Discussion

"Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). But, with respect to the free exercise of religion, prison inmates retain a right to reasonable opportunities for free exercise of religious beliefs, without concern for the possibility of punishment. *See Turner v. Safley,* 482 U.S. 78, 89 (1987); *Cruz v. Beto*, 405 U.S. 319, 322 (1972). That retained right is not unfettered, however. Prison restrictions that impact on the free exercise of religion but are related to legitimate penological objectives do not run afoul of the Constitution. *See Turner v. Safely*, 482 U.S. at 89-91.

The test to determine if the restrictions are justified requires examination of whether there is a rational relation between the asserted governmental interest and the regulation in question. Religious observances need not be uniform to merit First Amendment protection. *See Morrison v. Garraghty*, 239 F. 3d 648, 659 (4th Cir. 2001). Nonetheless, where there is a legitimate security concern at issue, such as insuring compliance with rules of behavior during worship services, temporary suspension of attendance at congregate worship does not violate the First Amendment. *See Turner*, 482 U.S. at 89-91 (1987) (restrictions that impact on the free exercise

of religion but are related to legitimate penological objectives do not run afoul of the Constitution).

From August 1, 2016 to September 21, 2016, plaintiff was the only Native American worshiper assigned to MAX II SH. So assigned, he was not permitted, due to security concerns, to attend religious services with general population inmates. Moreover, the inmate facilitator who conducted Native American worship for the general population inmates was not permitted to meet with plaintiff. During the time at issue, the Iron House Council came to NBCI on only one occasion, due to other commitments of the organization. When the representative came to NBCI, consistent with the settlement agreement, plaintiff met with the representative and the Chaplain for services.

Because the restrictions placed on plaintiff during this time were related to legitimate penological purposes regarding the safety of the institution, and as defendant did not violate the terms of the settlement agreement, defendant is entitled to summary judgment.[7]

A separate Order follows.


August 16, 2018                          /s/
Date                                     Ellen L. Hollander
                                           United States District Judge

---

[7] The court does not construe plaintiff's complaint as seeking to invalidate the settlement agreement or as alleging defendant violated its own policies. Therefore, I shall not consider defendant's argument as to these issues. Further, having found no constitutional violation, the court need not consider defendant's immunity defense.